IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| ANISSA D. JONES, | ) | CASE NO. 5:13-cv-02087 |
| | ) | |
| Plaintiff, | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| v. | ) | |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | |
| | ) | **MEMORANDUM OPINION & ORDER** |
| Defendant. | ) | |

Plaintiff Anissa D. Jones ("Plaintiff" or "Jones") seeks judicial review of the final

decision of Defendant Commissioner of Social Security ("Defendant" or "Commissioner")

denying her applications for social security disability benefits.  Doc. 1.  This Court has

jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned Magistrate

Judge pursuant to the consent of the parties. Doc. 14.   As explained more fully below, the

Administrative Law Judge ("ALJ") failed to adhere to the treating physician rule when

evaluating Jones' treating physician's opinion regarding her lifting/carrying restrictions and the

ALJ's Step Three analysis does not allow this Court the opportunity for meaningful review of the

ALJ's Step Three finding with respect to Jones' physical impairments.  Accordingly, the Court

**REVERSES AND REMANDS** the final decision of the Commissioner for further proceedings

consistent with this Opinion.

# I.  Procedural History

On March 11, 2010, Jones filed an application for Supplemental Security Income ("SSI") alleging a disability onset date of May 15, 2003 (Tr. 13, 200) and she protectively filed[1] an application for Disability Insurance Benefits ("DIB") alleging a disability onset date of February 22, 2010 (Tr. 13, 206, 229).[2]  She alleged disability due to a shoulder injury; ankle, knee and back pain; thyroid problems; headaches; sleep apnea; insomnia; obesity, pilonidal cyst;[3] and depression (Tr. 39-40, 72, 85, 100, 143, 155, 158, 164, 167, 233).  After initial denial by the state agency (Tr. 155-157, 158-160), and denial upon reconsideration (Tr. 164-166, 167-169), Jones requested a hearing (Tr. 170-176).  On April 16, 2012, Administrative Law Judge James A. Hill ("ALJ") conducted an administrative hearing.  Tr. 30-56.

In his April 26, 2012, decision (Tr. 10-29), the ALJ determined that Jones had not been under a disability from February 22, 2010, through the date of the decision.  Tr. 10-29.  Jones requested review of the ALJ's decision by the Appeals Council.  Tr. 8-9.  On July 25, 2013, the Appeals Council denied Jones' request for review, making the ALJ's decision the final decision of the Commissioner.  Tr. 1-5.

---

[1] The Social Security Administration explains that "protective filing date" is: The date you first contact us about filing for benefits. It may be used to establish an earlier application date than when we receive your signed application. http://www.socialsecurity.gov/agency/glossary/ (last visited 9/16/2014).

[2] In 2007, Jones had filed applications for social security benefits alleging disability beginning May 15, 2003.  Tr. 60.  Those applications were ultimately denied on January 28, 2010, after a hearing before an ALJ.  Tr. 13, 57-68. The Commissioner asserts that the January 28, 2010, decision is afforded administrative finality through the date of that decision and therefore the alleged disability onset date of February 22, 2010, applies to both Jones' DIB and SSI application.  Doc. 16, p. 2, n.1  Additionally, with respect to Jones' SSI application, the Commissioner asserts that, even if Jones were found to be disabled, she may not receive SSI payments for any period that precedes that month after the month in which her SSI application was filed.  Doc. 16, p. 2, n.1.  Jones does not dispute these contentions.

[3] Pilonidal means "of, relating to, or being a hair-containing cyst of the skin in the lower-back region near the upper crease of the buttocks."  http://www.merriam-webster.com/dictionary/pilonidal (last visited 9/16/2014).

## II. Evidence

**A.      Personal, educational and vocational evidence**

Jones was born in 1968.  Tr. 35.   She was 44 years old at the time of the hearing and lived alone.  Tr. 35, 36, 46.  She has three adult children and five grandchildren.  Tr. 46-47. Jones completed high school.[4]  Tr. 36, 234.    She is able to read and write in English.  Tr. 36.  In 2007, Jones received a child care certification.  Tr. 234.  Since 1999, she has worked only as a child care provider (Tr. 38, 234) and had not worked since her alleged onset date of February 22, 2010 (Tr. 37).  She mostly cared for children who were of school age but, after her children had children, she also cared for newborns.  Tr. 45.

**B.      Summary of relevant medical evidence**

Jones' arguments pertain to her physical impairments as opposed to her mental impairments, with the main focus of her argument being on the ALJ's treatment and consideration of the opinion of one of her treating physicians, Dr. Daniel B. Laszlo, M.D.[5]  Doc. 17, p.1

In his June 2, 2010, opinion, Dr. Laszlo indicated that Jones' medical conditions included depression, a ruptured ankle tendon and hypothyroidism.[6]  Tr. 304.  He noted that Jones' ankle problems had been present for 2 years.  Tr. 304.   He reflected ankle tenderness and indicated that Jones would need surgery for her ankle.[7]  Tr. 304.  Dr. Laszlo opined that, considering the

---

[4] During the hearing, Jones indicated that she received her diploma online. Tr. 36.

[5] As discussed more fully below, Jones also raises arguments regarding the ALJ's Step Three finding and his RFC assessment.

[6] As reflected in the ALJ's decision, Jones had other impairments, which the ALJ found were severe, including tendonitis tibialis, pilonidal cyst, obesity, anxiety disorder, and personality disorder.  Tr. 16.

[7] Jones' podiatrist had recommended surgery but she had not had the surgery because of a lack of insurance.  Tr. 19.

combined effects of her medical conditions, Jones would be unable to stand or walk during an 8 hour workday.  Tr. 305.  Her ability to sit would not be affected.  Tr. 305.  Her ability to lift/carry would be affected such that she would be able to lift/carry up to 5 pounds frequently, i.e, up to 2/3 of an 8 hour day, and occasionally, i.e., up to 1/3 of an 8 hour day.  Tr. 305.  He also opined that her ability to push/pull and perform repetitive foot movements would be extremely limited.  Tr. 305.  He opined that she was unemployable and that he expected her functional limitations to last between 30 days and 9 months.  Tr. 305.

**C.**    **Testimonial evidence**

**1.**    **Jones' testimony**

Jones was represented by counsel and testified at the hearing.[8]  Tr. 32-33, 34-50.  She weighed 270 pounds and was 5' 6" tall.  Tr. 35.  She reported having gained approximately 30 or 40 pounds over the prior year, which she attributed to her thyroid disease.[9]  Tr. 36.

When asked why she was unable to work, Jones stated that her ankle hurts her on a daily basis with some days being worse than others.  Tr. 40.  There are some days where her ankle bothers her to the point where she is in bed for days.  Tr.  40.  She reported that walking and standing aggravate her ankle pain. Tr. 40-41.   Jones estimated being able to stand for about 10 or 15 minutes and being able to walk for about 20 minutes before her pain becomes too difficult to manage.  Tr. 41.  Jones stated that she also has difficulty stooping, i.e., bending at her waist, and squatting, crouching and crawling.  Tr.  41-42.  She is unable to sit for an hour or two at a time because her pilonidal cyst flares up or her back starts to hurt.  Tr. 42.  When sitting, she leans to the left to take pressure off the hip that bothers her the most.  Tr. 42.  When her cyst

---

[8] At the start of her testimony, Jones noted that she may need to get up from time to time during the hearing.  Tr. 34-35.  The hearing started at 1:05 p.m.  Tr. 32.  During the hearing, the ALJ made note that, around 1:36 p.m., Jones stood up.  Tr. 50.

[9] Jones was taking medication for her hypothyroidism.  Tr. 44

4

flares up, Jones has to see her doctor to have her cyst drained.  Tr. 42-43.  She recently found out that she has Baker's cysts[10] in the back of her legs that prevent her from extending her legs completely.  Tr. 44.

Jones has a difficult time sleeping because she is unable to get comfortable.  Tr. 43.  She usually watches television until she falls asleep, which is normally around 5:00 or 6:00 in the morning and then she wakes up at 9:00 a.m.  Tr. 43.  She has headaches once a week and they last for about two to three days.  Tr. 43-44.  She has not been prescribed medication for her headaches.  Tr. 44.  However, she recently started taking Tramadol and Ibuprofen for her knee pain.  Tr. 44, 48.

Because of the problems with her ankle and knees, Jones falls once or twice each month when she is going up and down the stairs or just walking on a flat surface.  Tr.  48.  Although she lives alone, Jones indicated that, most of the time, her children take turns being with her because of her falls.  Tr. 46.  They assist her with cooking, cleaning, shopping, etc.  Tr. 46.  When she was working as a childcare provider, she had assistance from her 16 year old daughter.  Tr. 49.

She feels depressed.  Tr. 44.   For example, at times, she is sad and does not know why; she disassociates herself; she has crying spells.  Tr. 44.  Her energy level is low.  Tr. 44-45.  She has anxiety attacks.  Tr. 45.  She has had suicidal thoughts and she tried to commit suicide in 1999.  Tr. 45.  She sees a psychologist at Portage Path for her depression and anxiety issues and her family doctors prescribe medication for her depression and anxiety. Tr. 47-48.

---

[10] A Baker's cyst is "a swelling behind the knee that is composed of a membrane-lined sac filled with synovial fluid and is associated with certain joint disorders (as arthritis)."  http://www.merriam-webster.com/medical/baker's%20cyst (last visited 9/16/2014).

Jones typically spends her day in her room.  Tr. 46  She watches television sometimes. Tr. 46.  Jones has a driver's license and is able to drive.  Tr. 36.  She has a handicap placard.  Tr. 50.

### 2.    Vocational Expert's testimony

Vocational Expert ("VE") Mark Anderson testified at the hearing.  Tr. 50-55.  The VE indicated that Jones had worked primarily as a childcare worker, which the VE described as a medium, semi-skilled position.  Tr. 52.  The ALJ proceeded to ask the VE hypothetical questions.  Tr. 52-54.

For the first hypothetical, the ALJ asked the VE to assume a younger individual with a high school education and Jones' past work history who can perform sedentary work but cannot climb ladders, ropes, or scaffolds and can rarely climb ramps and stairs; who can understand, remember, and carry out simple instructions and perform simple, routine tasks; who requires a relatively static and low-stress workplace with few changes in work settings and work processes, and without strict quotas or fast-paced production demands; and who can interact with the public and coworkers on a superficial basis.  Tr. 52.  The ALJ then asked whether the described individual could perform Jones' past work.  Tr. 52.  The VE indicated that the described individual would be unable to perform Jones' past work.  Tr. 52.  However, the VE indicated that there would be sedentary, unskilled work available in the regional or national economies that the described individual could perform, including (1) patcher with 280,000 jobs available nationwide, 25,000 statewide, and 4,500 in the region; (2) document preparer with 180,000 jobs available nationwide, 19,000 statewide, and 4,000 in the region; and (3) touch-up screener with 158,000 jobs available nationwide, 5,200 statewide, and 1,700 in the region.  Tr. 52-53.

For the second hypothetical, the ALJ asked the VE to assume the individual described in his first hypothetical except that the individual would also need a sit/stand option, allowing for a change in positions at least every 30 to 45 minutes and then asked the VE whether the previously identified jobs would remain available.  Tr. 53.   The VE indicated that the sit/stand option would not impact the availability of the identified jobs.  Tr. 53.

For the third hypothetical, the ALJ asked the VE to assume the individual described in the second hypothetical with the additional requirement that the individual would be required to take at least three to four unscheduled work breaks of 15-20 minutes each because of severe pain and fatigue and that the individual would be absent from work more than two days each month because of her medical condition. Tr. 53.  The VE indicated that, because of the unscheduled break limitation, there would be no jobs available to the described individual.  Tr. 53-54.  The VE also indicated that an employer would not tolerate more than two absences per month on an ongoing basis. Tr. 54-55.  In response to a question from Jones' counsel, the VE also indicated that none of the three identified jobs would require being around dangerous moving machinery. Tr. 55.

### III. Standard for Disability

Under the Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work

experience, engage in any other kind of substantial gainful work which exists in the national economy[11] . . . .

42 U.S.C. § 423(d)(2)(A).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1.      If the claimant is doing substantial gainful activity, he is not disabled.

2.      If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.      If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment,[12] claimant is presumed disabled without further inquiry.

4.      If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work.  If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.      If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920;[13] *see also* Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987).

Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.

---

[11] "'[W]ork which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country."  42 U.S.C. § 423(d)(2)(A).

[12] The Listing of Impairments (commonly referred to as Listing or Listings) is found in 20 C.F.R. pt. 404, Subpt. P, App. 1, and describes impairments for each of the major body systems that the Social Security Administration considers to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience.  20 C.F.R. § 404.1525.

[13] The DIB and SSI regulations cited herein are generally identical.  Accordingly, for convenience, further citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 et seq.  The analogous SSI regulations are found at 20 C.F.R. § 416.901 et seq., corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds to 20 C.F.R. § 416.920).

*Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the Commissioner at Step Five to establish whether the claimant has the RFC and vocational factors to perform work available in the national economy.  *Id.*

## IV. The ALJ's Decision

In his April 26, 2012, decision, the ALJ noted that Jones had a prior unfavorable Administrative Law Judge decision dated January 28, 2010.  Tr. 13.  The ALJ considered and discussed the applicability of *Drummond v. Commissioner*, 126 F.3d 837 (6th Cir. 1997) with respect to the prior ALJ decision.  Tr. 13.  The ALJ concluded that Jones had submitted new and material evidence that showed a change in circumstances beginning in February 22, 2010, i.e., Jones' foot condition had worsened, such that the ALJ was not bound by the findings of the previous ALJ.  Tr. 13.  The ALJ also made the following findings:[14]

1.  Jones met the insured status requirements through March 31, 2010.  Tr. 15.

2.  Jones had not engaged in substantial gainful activity since February 22, 2010, the alleged onset date.  Tr. 15-16.

3.  Jones had the following severe impairments: tendonitis tibialis, pilonidal cyst, obesity, depression, anxiety disorder, personality disorder, hypothyroidism, and a ruptured tendon in foot and ankle.  Tr. 16. Jones' obstructive sleep apnea, headaches and insomnia were non-severe impairments.  Tr. 16.

4.  Jones did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments. Tr. 16-18.

5.  Jones had the RFC to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except she could not climb ladders, ropes, or scaffolds, and can rarely climb ramps and stairs.  She required a sit/stand option, changing positions every 30-45 minutes.  She could understand, remember, and carry out simple instructions, and perform simple, routine tasks.  She required a relatively static and low stress workplace with few changes in work settings and work processes and without strict quotas or

---

[14] The ALJ's findings are summarized.

fast-paced high production demands. She could interact with the public and coworkers on a superficial basis. Tr. 18-22.

6.      Jones was unable to perform her past relevant work. Tr. 22-23.

7.      Jones was born in 1968 and was 42 years old, defined as a younger individual age 18-49, on the alleged disability onset date. Tr. 23.

8.      Jones had at least a high school education and was able to communicate in English. Tr. 23.

9.      Transferability of job skills was not material to the determination of disability. Tr. 23.

10.      Considering Jones' age, education, work experience, and RFC, there were other jobs that existed in significant numbers in the national economy that Jones could perform, including patcher, document preparer, and touch-up screener. Tr. 23-24.

Based on the foregoing, the ALJ determined that Jones had not been under a disability from February 22, 2010, through the date of the decision. Tr. 24.

## V. Parties' Arguments

### A.      Plaintiff's arguments

Jones presents three arguments. Doc. 12, pp. 8-18; Doc. 17, pp. 1-4. First, she argues that the ALJ erred by failing to acknowledge and/or analyze the opinion of her treating physician Dr. Laszlo regarding her ability to lift/carry up to 5 pounds. Doc. 12, pp. 8-12; Doc. 17, pp. 1-4. Alternatively, Jones argues that, if the Court concludes that the ALJ considered but rejected the opinion of Dr. Laszlo regarding Jones' ability to lift/carry, the ALJ erred because he failed to provide good reasons for rejecting the opinion. Doc. 12, pp. 12-14; Doc. 17, pp. 1-4.

Second, Jones argues that the ALJ erred by not properly analyzing and/or finding that Jones had an impairment or combination of impairments that met or equaled the requirements for Listing 1.02, *Major dysfunction of a joint(s) (due to any cause)*. Doc. 12, pp. 14-17.

Third, Jones argues that the RFC is not supported by substantial evidence because of the ALJ's failure to properly or adequately consider Dr. Laszlo's opinion and/or because the ALJ failed to properly consider Jones' inability to sustain work activities on a regular and continuing basis for 8 hours per day, 5 days per week due to her pain.  Doc. 12, pp. 17-18.

## B.     Defendant's arguments

The Commissioner contends that the ALJ's RFC and ultimate disability decision are supported by substantial evidence.  Doc. 16, pp. 17-18, 20-21, 22-23.

The Commissioner also argues that the ALJ clearly considered Dr. Laszlo's opinion and that the ALJ's consideration of that opinion was proper.  Doc. 16, pp. 19-21.  The Commissioner notes that, not only did the ALJ consider Dr. Laszlo's opinion, but that opinion was also unexplained, unsupported and presented in a check box report.  Doc. 16, p. 19.  Further, the Commissioner argues that, in light of the evidence of record, the ALJ adequately accounted for Jones' limitations in the RFC.  Doc. 16, pp. 19-20.  Thus, the ALJ's lack of specific reference to Dr. Laszlo's checkmark limitation that Jones could lift/carry up to 5 pounds was harmless.  Doc. 16, p. 20.

With respect to Jones' Listing argument, the Commissioner contends that Jones failed to meet her burden of showing that she met or equaled Listing 1.02, noting that no physician opined or suggested that Jones met or equaled Listing 1.02.  Doc. 16, pp. 21-23.  Further, the Commissioner argues that Listing 1.02 requires a showing of an inability to ambulate effectively, as defined in Listing

1.02B2b, and Jones is unable to point to evidence to satisfy that requirement. Doc. 16, p. 22.

## VI. Law & Analysis

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record. 42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). Accordingly, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

A.      **The ALJ violated the treating physician rule by failing to discuss and/or provide reasons for discounting Jones' treating physician's opinion which restricted Jones to lifting/carrying up to 5 pounds occasionally and frequently**

Jones argues that the ALJ violated the treating physician rule by failing to acknowledge or consider Dr. Laszlo's opinion that Jones was restricted to lifting/carrying up to 5 pounds

occasionally and frequently.[15]  Doc. 12, pp. 8-12; Doc. 17.  Alternatively, Jones also argues that, if the ALJ considered and rejected Dr. Laszlo's opinion regarding lifting/carrying restrictions, the ALJ erred because he failed to provide any reason for the rejecting the opinion.  Doc. 12, pp. 12-14; Doc. 17.

The Commissioner responds that the decision makes clear that the ALJ considered Dr. Laszlo's June 2, 2010, opinion.  Doc. 16, p. 20.  The Commissioner argues that Dr. Laszlo's opinion was unexplained, unsupported by Dr. Laszlo's remarks on the form, and unsupported by Dr. Laszlo's own examination findings; and the reliability of the opinion is suspect because it was in the form of a check box report.  Doc. 16, p. 19.  The Commissioner also argues that the ALJ adequately accounted for Jones' mental health and standing/walking limitations.  Doc. 16, p. 20.  Finally, the Commissioner suggests that, in light of the foregoing, the ALJ's error, if any, in failing to specifically refer to the opinion regarding Jones' ability to lift/carry was harmless. Doc. 16, p. 20.

Since Dr. Laszlo was a treating physician,[16] the ALJ was required to adhere to the treating physician rule when evaluating his opinions.  Under the treating physician rule, "[a]n ALJ must give the opinion of a treating source controlling weight if he finds the opinion well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with the other substantial evidence in the case record."  *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013); 20 C.F.R. § 404.1527(c)(2).

---

[15] Although not raised by Jones, the Court notes that the ALJ did not discuss Dr. Laszlo's opinion that Jones would be extremely limited in her ability to push/pull or perform repetitive foot movements.

[16] The Commissioner does not contend that Dr. Laszlo was not a treating physician.

If controlling weight is not provided, an ALJ must apply certain factors to determine what weight should be given to the treating source's opinion, and the Commissioner's regulations also impose a clear duty on an ALJ always to give good reasons in the notice of determination or decision for the weight given to treating source opinions.[17] *Cole v. Comm'r of Soc. Sec.*, 661 F.3d 931, 937 (6th Cir. 2011) (citing 20 C.F.R. § 404.1527(d)(2)); *Bowen v. Comm'r of Soc Sec.*, 478 F.3d 742, 747 (6th Cir. 2007).  "Those good reasons must be supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight."  *Cole*, 661 F.3d at 937 (quoting Soc. Sec. Rul. No. 96-2p, 1996 SSR LEXIS 9, at *12 (Soc. Sec. Admin. July 2, 1996)) (internal quotations omitted).  "This requirement is not simply a formality; it is to safeguard the claimant's procedural rights [and] [i]t is intended 'to let claimants understand the disposition of their cases, particularly in situations where a claimant knows that his physician has deemed him disabled and therefore might be especially bewildered when told by an administrative bureaucracy that he is not.'"  *Id.* at 937-938 (citing *Wilson*, 378 F.3d at 544).  Moreover, "the requirement safeguards a reviewing court's time, as it 'permits meaningful' and efficient 'review of the ALJ's application of the treating physician rule.'"  *Id.* at 938 (citing *Wilson*, 378 F.3d at 544-545).  An "ALJ's failure to follow agency rules and regulations denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record."  *Cole*, 661 F.3d at 939-940 (citing *Blakely v. Comm'r of Soc Sec*, 581 F.3d 399, 407 (6th Cir. 2009) (internal quotations omitted)).  Inasmuch as 20 C.F.R. § 404.1527(c)(2) creates important procedural protections for claimants, failure to

---

[17] The factors to be considered are: (1) the length of the treatment relationship and the frequency of the examination, (2) the nature and extent of the treatment relationship, (3) the supportability of the opinion, (4) the consistency of the opinion with the record as a whole, (5) the specialization of the source, and (6) any other factors which tend to support or contradict the opinion.  *Bowen v. Comm'r of Soc Sec.*, 478 F.3d 742, 747 (6th Cir. 2007); 20 C.F.R. §§ 404.1527(c), 416.927(c).

follow the procedural rules for evaluating treating physician opinions will not be considered harmless error simply because a claimant may appear to have had little chance of success on the merits.  *Wilson*, 378 F.3d at 546-547.

In discussing Dr. Laszlo's June 2, 2010, opinion, the ALJ stated:

> Dr. Laszlo, the claimant's primary care physician in 2010, opined that the claimant cannot stand or walk at all, but had no limits on sitting, due to her foot problems (Exhibit B3F/3).  I afford this opinion some weight, as it is generally consistent with the claimant's foot treatment notes.  However, the notes do not indicate that she is completely unable to stand, because she does not need a scooter to ambulate.  I have reflected this inability to stand for long periods by reducing her to sedentary work.

Tr. 19.

Even though the foregoing demonstrates that ALJ discussed and explained the weight he provided to Dr. Laszlo's opinion with respect to Jones' standing limitations and may have reviewed the entirety of Dr. Laszlo's June 2, 2010, opinion, the ALJ did not clearly articulate reasons for discounting or dismissing Dr. Laszlo's opinion regarding Jones' lifting/carrying restrictions. Since the ALJ failed to discuss or assign weight or provide any reason, let alone "a good reason," as to why he disregarded Dr. Laszlo's opinion regarding Jones' lifting/carrying restrictions, the Court is unable to find that the ALJ sufficiently complied with the treating physician rule with respect to Dr. Laszlo's opinion.  *Cole*, 661 F.3d at 939-940; *see also Wilson*, 378 F.3d at 546-547.

The Commissioner argues that the ALJ properly rejected Dr. Laszlo's lifting/carrying opinion because the opinion was unexplained, unsupported by Dr. Laszlo's remarks on the form, and unsupported by Dr. Laszlo's own examination findings, and because the opinion was provided in a check box report.  Doc. 16, pp. 19-21.  Since the ALJ did not discuss, or even mention, Dr. Laszlo's opinion regarding lifting/carrying restrictions, this argument is nothing

more than improper *post hoc rationalization* and may not be relied upon to support the ALJ's decision. *See Simpson v. Comm'r of Soc. Sec.*, 344 Fed. App. 181, 192 (6th Cir. 2009) (a reviewing court must assess the propriety of the administrative agency's action on the grounds invoked by the agency) (citing *SEC v. Cherney Corp.*, 332 U.S. 194, 196 (1947)).

Additionally, to the extent that the Commissioner has attempted to argue that the ALJ's lack of compliance with the treating physician rule was harmless, the Court finds the Commissioner's argument unpersuasive.[18]  Harmless error may be applied in regard to a treating physician error only in limited situations, such as (1) where the opinion is so "patently deficient that the Commissioner could not possibly credit it;" (2) "if the Commissioner adopts the opinion of the treating source or makes findings consistent with the opinion;" or (3) "where the Commissioner has met the goal of § 1527(d)(2) . . . even though she has not complied with the terms of the regulation." *Cole v. Astrue*, 661 F.3d 931, 940 (6th Cir. 2011) (citing *Friend v. Comm'r of Soc. Sec.*, 375 Fed. Appx. 543, 551 (6th Cir. 2010).

Contrary to the Commissioner's suggestion, although Dr. Laszlo's lifting/carrying opinion was rendered on a check box form, it was not harmless error for the ALJ not to mention it or provide reasons for rejecting it. First, while Dr. Laszlo's June 2, 2010, opinion included check box questions/answers, it also included Dr. Laszlo's description of Jones' conditions, which included a ruptured tendon in her ankle.  Tr. 304.  Dr. Laszlo also provided information regarding the duration of her conditions and noted that she would need surgery on her ankle.  Tr. 304.  Thus, contrary to the Commissioner's claim, Dr. Laszlo did more than check boxes.

---

[18] The Commissioner's harmless error argument is cursory and vague.  Thus, the Commissioner has arguably waived a harmless error argument.  *McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997) ("Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.  It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones.")  (internal citations omitted). Even if not waived, as discussed herein, the Court concludes that the ALJ's error was not harmless.

Second, the ALJ considered other portions of Dr. Laszlo's opinion without taking issue with the

format of the opinion.  Finally, while a check box type form may not be entitled to controlling

weight, the Commissioner has failed to demonstrate that a check box form is patently deficient

such that an ALJ is not required to consider or discuss the opinion.  *See Curler v. Comm'r of Soc.*

*Sec.*, 561 Fed. Appx. 464, 471 (6th Cir. 2014) (finding that the ALJ had adequately explained his

consideration of a treating physician's check box form evaluation); *Coy v. Astrue*, 2012 WL

5497850, * 8 (N.D. Ohio Nov. 13, 2012) (rejecting the Commissioner's argument that the ALJ

was free to disregard a physician's opinion simply because it was contained in a "check-a-box"

type form).  Accordingly, even if the Commissioner's harmless error argument was not waived,

the Commissioner has not demonstrated that the ALJ's failure to mention Dr. Laszlo's

lifting/carrying opinion was harmless error.[19]

Further, to the extent the Commissioner contends that the ALJ adequately accounted for

Jones' mental health limitations and standing/walking limitations and therefore his error was

harmless, that argument is also unpersuasive.  Doc. 16, p. 20.  The ALJ assessed Jones as having

the RFC to perform sedentary work as defined in 20 CFR §§ 404.1567(a) and 416.967(a), with

additional limitations such as the need for a sit/stand option and ability to change positions every

30-45 minutes. Tr. 18.  Jones argues that the ALJ's failure to consider or adequately account for

her lifting/carrying limitations as set forth in Dr. Laszlo's opinion is not harmless error because,

if the ALJ had accepted Dr. Laszlo's opinion as to her weight restriction, her functional capacity

would be less than that required for sedentary work and there would be no work available.  Doc.

12, p. 11.  Indeed, the definition of sedentary work does contain a weight restriction, which is

---

[19] In his opinion, Dr. Laszlo was asked how long Jones' physical and/or mental functional limitations were expected to last, and he opined "between 30 days and 9 months."  Tr. 305.  The Commissioner does not contend that this statement rendered Dr. Laszlo's opinion patently deficient.

greater than the 5 pound restriction contained in Dr. Laszlo's opinion.  Sedentary work is defined as follows:

> Sedentary work involves lifting no more than *10 pounds* at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

20 CFR §§ 404.1567(a) and 416.967(a) (emphasis supplied).

The Commissioner does not contend that the ALJ's RFC finding that Jones could perform sedentary work as defined in 20 CFR §§ 404.1567(a) and 416.967(a) is consistent with Dr. Laszlo's 5 pound lifting/carrying restriction.  Further, an inability "to lift 10 pounds or occasionally lift and carry items like docket files, ledgers, and small tools throughout the workday" will erode the unskilled sedentary occupational base.  *See* SSR 96-9p, 1996 WL 374185, * 6 (July 2, 1996).  However, "[t]he extent of the erosion will depend on the extent of the limitations." *Id*.  Thus, where someone's ability to lift or carry is less than 10 pounds, SSR 96-9p indicates that consultation by the ALJ with a vocational expert may be appropriate.  *Id*. Since the ALJ here did not elicit VE testimony as to the extent, if any, that the sedentary occupational base would be eroded if the hypothetical individual was unable to occasionally or frequently lift/carry more than 5 pounds, the Court is unable to conclude that the ALJ's failure to discuss or provide reasons for disregarding Dr. Laszlo's 5 pound lifting/carrying restriction was harmless error.

For the reasons set forth herein, the Court finds that the ALJ's consideration and discussion of Dr. Laszlo's opinion fell short of meeting the procedural requirements of the treating physician rule and does not allow this Court the opportunity to determine whether the RFC and ultimate disability determination are supported by substantial evidence.  Moreover, the

Court cannot conclude that the ALJ's failure to adhere to the treating physician rule was harmless.  Accordingly, reversal and remand is warranted for compliance with the treating physician rule.

**B.      Remand is required for further articulation at Step Three regarding Listing 1.02**

Jones argues that, when analyzing her impairments at Step Three, the ALJ failed to properly analyze whether her impairments met or equaled Listing 1.02A.  Doc. 12, pp. 14-17. Listing 1.02A addresses Major dysfunction of a joint(s) (due to any causes), which is:

> Characterized by gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s). With:
>
> > A. Involvement of one major peripheral weight-bearing joint (i.e., hip, knee, or ankle), resulting in inability to ambulate effectively, as defined in 1.00B2b

20 C.F.R. Part 404, Subpt. P, App. 1, Listing §1.02.

"Ineffective ambulation" under Listing 1.00B2B is defined generally as "having insufficient lower extremity functioning . . . to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities" and "examples of ineffective ambulation include, but are not limited to, the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces . . . " 20 C.F.R. Part 404, Subpt. P, App. 1, Listing §1.00B2b.

The Commissioner has a duty to make clear the reason or reasons for the disability determination.  42 U.S.C. § 405(b)(1).  Under the Social Security Act,

> The Commissioner of Social Security is directed to make findings of fact, and decisions as to the rights of any individual applying for a payment under this title [42 USCS §§ 401 et seq.]. Any such decision by the Commissioner of Social Security which involves a determination of disability and which is in whole or in

part unfavorable to such individual shall contain a statement of the case, in understandable language, setting forth a discussion of the evidence, and stating the Commissioner's determination and the reason or reasons upon which it is based . . .

42 U.S.C. § 405(b)(1).

In accordance with this statute, the ALJ is "required to discuss the evidence and explain why he found that appellant was not disabled at step three." *Clifton v. Chater*, 79 F.3d 1007, 1009 (10th Cir. 1996). A claimant who is found to have an impairment that meets or medically equals a Listing at Step Three is entitled to benefits regardless of an ALJ's conclusions at Steps Four or Five. *Reynolds v. Comm'r of Soc. Sec.*, 424 Fed. Appx. 411, 416 (6th Cir. 2011). Without an evaluation of the evidence, comparison of that evidence to the Listings and an explained conclusion, meaningful judicial review cannot occur; "it is impossible to say that the ALJ's decision at Step Three was supported by substantial evidence." *Id.* (*citing Clifton*, 79 F.3d 1007, 1009). That is why the Sixth Circuit found, in *Reynolds*, that an ALJ's failure to analyze a claimant's physical condition in relation to the Listed Impairments was not harmless error. *Id.; see also May v. Astrue*, 2011 U.S. Dist. LEXIS 88551, *24-25 (N.D. Ohio June 1, 2011) *report and recommendation adopted*, *May v. Astrue*, 2011 U.S. Dist. LEXIS 88548 (N.D. Ohio Aug. 10, 2011).

Here, at Step Three, the ALJ provided a lengthy discussion of Jones' mental impairments. Tr. 17-18. With respect to Jones' physical impairments, the ALJ stated:

In terms of the claimant's physical impairments, no treating or examining physician has indicated findings that would satisfy the severity requirements of any listed impairment. In reaching the conclusion that the claimant does not have an impairment or combination of impairments that meet or medically equal a listed impairment, I also considered the opinion of the State Agency medical consultants who evaluated this issue at the initial and reconsideration levels of the administrative review process and reached the same conclusion. All of the

listings were considered in reaching this finding, with specific emphasis on listing 1.02.[20]

Tr. 16 (internal citations omitted).

The Commissioner argues that, Jones' contention that the ALJ failed to properly analyze her impairments at Step Three is without merit because there is no evidence of record that "even remotely suggested that Plaintiff met or equaled Listing 1.02A; it rather conclusively establishes that she did not." Doc. 16, p. 22.   However, the ALJ essentially provided no comparison of the evidence to Listing 1.02 to allow this Court the ability to conduct a meaningful review of the ALJ's Step Three finding.[21]  Thus, although further articulation by the Commissioner at Step Three may not result in a different result regarding whether Jones' impairments met or equaled Listing 1.02 since remand is already necessary to ensure compliance with the treating physician rule, the Commissioner should provide a more thorough Step Three analysis on remand.

## C.    Other issues

Relying in part on her claim that the ALJ did not properly consider Dr. Laszlo's opinion, Jones also argues that the RFC is not supported by substantial evidence.  On remand, a more thorough analysis and/or evaluation of Dr. Laszlo's opinion and at Step Three may impact the Commissioner's RFC assessment and/or later steps in the sequential evaluation.  *See Trent v. Astrue*, Case No. 1:09CV2680, 2011 U.S. Dist. LEXIS 23331, at *19 (declining to address the plaintiff's remaining assertion of error because remand was already required and, on remand, the

---

[20] Separately, when discussing Dr. Laszlo's opinion, the ALJ notes that Jones did not need a scooter to ambulate. Tr.19.

[21] For example, the ALJ cited, as support for his finding that Jones' physical impairments did not meet or equal a Listing, the fact that state agency physicians who reviewed the issue had reached the same conclusion. Tr. 16. However, when weighing the medical opinion evidence, it appears that the ALJ provided no weight to those same opinions.  Tr. 21 (affording no weight to the opinions of the state agency physicians who opined that Jones' physical impairments were not severe because they did not last 12 months).

ALJ's application of the treating physician rule might impact his findings under the sequential

disability evaluation).  Thus, this Opinion does not address Jones' separate RFC argument.

### VII. Conclusion

For the reasons set forth herein, the Court **REVERSES and REMANDS** the

Commissioner's decision.[22]

Dated:  September 22, 2014

_____
Kathleen B. Burke
United States Magistrate Judge

---

[22] This opinion should not be construed as requiring a determination on remand that Jones is disabled.